J-A11007-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL L. JACKSON | : | |
| | : | |
| Appellant | : | No. 638 WDA 2020 |

Appeal from the Judgment of Sentence Entered July 11, 2019
In the Court of Common Pleas of Butler County Criminal Division at
No(s): CP-10-CR-0001404-2018

BEFORE: McLAUGHLIN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:               **FILED: September 7, 2021**

Michael L. Jackson appeals from the judgment of sentence entered following his jury-trial convictions for six counts of conspiracy[1] and for violations of the Controlled Substance, Drug, Device, and Cosmetic Act.[2] Jackson challenges the sufficiency of the evidence supporting the conspiracy convictions. We conclude the evidence was sufficient to support the conviction for conspiracy to possess with intent to deliver ("PWID") 16 bags of heroin, but not the remaining conspiracy convictions. We affirm in part, vacate in part, and remand.

In June 2018, the Butler City Police and Pennsylvania Office of the Attorney General drug enforcement task force conducted a controlled

_____

[1] 18 Pa.C.S.A. § 903.

[2] 35 P.S. §§780-101 et al.

purchase of heroin from Jackson. The supervisor for criminal investigation at the Cranberry Township Police Department, Detective Matthew Irvin, testified that on June 27, 2018, the task force worked with a confidential informant, Donald Griffin, ("CI"). N.T., 6/24/19, at 30. The CI identified Jackson as a source of heroin, and set up a purchase of a bundle, or ten bags, of heroin from Jackson. *Id.* at 31-32. Detective Irvin testified that he slowly drove by the house where the transaction was about to occur, and saw Jackson open the door for the CI. *Id.* at 38. After the purchase, task force members met with the CI, and recovered 16 bags of heroin, which the CI purchased with pre-recorded buy money. *Id.* at 39. Detective Irwin testified that the CI told him that Jackson "thr[e]w" in the extra six bags for the CI to sell. *Id.*

Detective Irwin testified that that same evening a judge approved a search warrant for the house at which the control buy occurred, and the task force executed the warrant. *Id.* at 40-41. The task force detained four people at the house, including Jackson and his alleged co-conspirator, Noah Burnside.[3] *Id.* at 42.

Jackson was found on the second floor, and in that area, the police found empty unused stamp bags and a powdery substance on the floor. *Id.* at 45; *accord* N.T., 6/25/19, at 13-16 (Agent Jason Hammerman, a narcotics agent with the Pennsylvania Office of Attorney General, also testified about the execution of the search warrant and testified he located Jackson at the top of

_____

[3] Jackson and Burnside were not tried together.

the stairs, with drug packaging materials and a powdery substance). In one of the three bedrooms, which was determined to be Jackson's, the police found heroin, cocaine, stamp bags, latex gloves, a face shield, digital scales, rubber bands, an electronic mixer, other drug paraphernalia, and $61.00. N.T., 6/24/19, at 47-55, 75.[4]

Agent Justin Shaffer, a narcotics agent with the Pennsylvania Office of Attorney General, testified that he searched Jackson after they located him at the residence. N.T., 6/25/19, at 24. Agent Shaffer recovered from Jackson's pants' pocket a large sum of money, in excess of $1,500. *Id.* Further, Officer Cory Fleming of the Butler City Police Department testified that he and another officer conducted a strip search of Jackson and recovered a small plastic bag with several pills protruding from his rectum. *Id.* at 29. The pills were determined to be Fentanyl. N.T., 6/24/19, at 63.

Agent Richard E. Woznicki, a narcotics agent with the Pennsylvania Attorney General Office, testified that when the CI approached the house for the scheduled drug purchase, the agent saw Jackson open the door. N.T., 6/25/19, at 39. He testified that some of the money recovered from Jackson matched the pre-recorded buy money provided to the CI. *Id.* at 53-54. The Commonwealth asked whether the evidence was of "a large scale operation based on your training and experience." *Id.* at 56. He responded that "[w]ith

_____

[4] Corporal William Och of the Cranberry Township Police Department also testified. He was involved with the controlled buy and execution of the search warrant, and his testimony corroborated Detective Irvin's testimony.

the amount of heroin, fentanyl, crack cocaine, it's definitely someone who is more than just a street level trafficker." *Id.* He testified that the amount of drugs and the other items located, including "the scales, strainer, the masks, the gloves, the stamp bags, the empty stamp bags," and the U.S. currency, were "indicative of a drug trafficker." *Id.* at 60.

The Commonwealth also presented the testimony of the CI. He said he set up a controlled purchase of heroin from Jackson through text message. N.T., 6/24/19, at 77-78. He testified that in his previous dealings with Jackson, Jackson worked "solo," and he was "not sure" if he worked with anyone else. *Id.* at 78. He stated that when he arrived at the house to purchase the heroin, Jackson and Burnside were there. *Id.* at 79-80. The CI was not sure whether Burnside was working with Jackson but testified he "probably was." *Id.* at 80. He testified he paid Jackson on the first floor, followed him to the second bedroom on the second floor, and Jackson handed him the stamp bags of heroin. *Id.* at 80-82. The CI further testified regarding text messages between himself and Burnside, where they talked about "[g]etting the money for the drugs." *Id.* at 84. The CI thought the messages related to the drug purchase at issue. *Id.* He agreed that the messages from Burnside were asking where he was and when he would be there. *Id.*

A jury found Jackson guilty of conspiracies to commit:

- PWID of 16 bags of heroin ("heroin conspiracy");
- PWID of 27 bags of heroin, 20 bags of crack cocaine, 2 bags of raw heroin, and a bag of pills ("multiple narcotics conspiracy");

- Criminal Use of a Communication Facility ("communication facility conspiracy");

- Possession of 27 stamp bags of heroin, 20 bags of crack cocaine, 2 bags of raw heroin, and a bag of unknown pills ("possession conspiracy");

- Possession of drug paraphernalia ("drug paraphernalia conspiracy"); and

- PWID of Fentanyl ("Fentanyl conspiracy").[5]

The jury also convicted Jackson of PWID of 16 bags of heroin; PWID of 27 stamp bags of heroin, 20 bags of crack cocaine, 2 bags of raw heroin, and a bag of unknown pills; possession of 27 stamp bags of heroin, 20 bags of crack cocaine, 2 bags of raw heroin, and a bag of unknown pills; possession of drug paraphernalia; and possession of Fentanyl.

The court sentenced Jackson in total to 117 months to 234 months' incarceration followed by two years' probation. Jackson filed a post-sentence motion,[6] which was denied by operation of law. Jackson filed this timely appeal. He raises the following issue:

> Was the evidence insufficient to convict [Jackson] of the multiple conspiracies he was convicted of, particularly in light of 18 Pa.C.S. § 903(c), where there was no record evidence that [Jackson] and his alleged co-conspirator had entered into multiple agreements with differing objectives?

---

[5] 18 Pa.C.S.A. § 7512(a) and 35 Pa.C.S.A. §§ 780-113(a)(30), 780-113(a)(16), 780-113(a)(32), respectively.

[6] Jackson's trial counsel filed a motion to dismiss. Later that same day, new counsel entered his appearance and filed a motion. Trial counsel then filed a motion to withdraw his appearance and the post-sentence motion he filed. The trial court granted the motion to withdraw.

Jackson's Br. at 4.

Jackson argues there "was insufficient evidence of record for the jury to find Jackson guilty of one conspiracy let alone six." Jackson's Br. at 17. He maintains that the jury's finding of a conspiratorial agreement here required guesswork. Jackson concedes that Burnside was identified as a person detained during the search and the CI testified about him but was unsure whether the text messages pertained to this buy or a prior one. Jackson notes that when the CI was asked if the messages related to this or a prior buy, he stated, "This is, I think this is for the same one." *Id.* at 21 (citation omitted).

Jackson also claims the sole evidence of the conspiracy came from a leading question, which is not evidence. The leading question was, "So Mr. Burnside asked where you were when you were coming to buy the drugs off Mr. Jackson?" Jackson claims the CI never agreed that he was "coming to buy the drugs off Mr. Jackson." He notes the CI responded, "And asking when I was going to be able to get them off." *Id.* (citation omitted).

Jackson further argues that, if there was enough evidence to prove the heroin conspiracy, Jackson could not also be convicted of the communication facility conspiracy. He argues that, under 18 Pa.C.S.A. § 903(c), the use of the communication facility and PWID of 16 bags of heroin "would be subsumed within a single count of conspiracy." Jackson's Br. at 26.

The Commonwealth counters that the CI's testimony "very clearly satisfied the statutory requirements necessary to sustain a verdict of guilt for"

the heroin and communication facility conspiracies.[7] Commonwealth's Br. at 2. It notes that the CI testified that he and Burnside exchanged text messages and that he obtained heroin from Jackson, per the agreement in the text messages, and argues that Burnside's use of his cell phone was an overt act. *Id.* at 7.

The Commonwealth continues that "the balance of [its] evidence sufficiently proved the remaining [conspiracy counts] beyond a reasonable doubt." *Id.* at 2. It argues that "inside the residence where [] Burnside and [Jackson] were located was a significant amount of drugs in various states of packaging, along with packaging materials, and money." *Id.* It claims the evidence and testimony "allows a reasonable inference to be drawn that [] Burnside and [Jackson] were working in concert and agreement in committing multiple criminal acts." *Id.* at 2-3.

In its Rule 1925(a) opinion, the trial court found the evidence at trial was sufficient to prove, beyond a reasonable doubt, that Jackson committed the heroin conspiracy and the communication facility conspiracy. However, it found the evidence insufficient to prove the multiple narcotics conspiracy, drug paraphernalia conspiracy, possession conspiracy, or Fentanyl conspiracy. Trial Ct. Op., filed Sept. 9, 2020, at 3.

---

[7] Although in its brief the Commonwealth says the testimony supported the conviction for the communication facility conviction, Commonwealth's Br. at 2, it conceded at argument that the communication facility conspiracy conviction could not stand. As discussed below, we agree.

"The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Barnes*, 871 A.2d 812, 819 (Pa.Super. 2005) (citation omitted), *aff'd*, 924 A.2d 1202 (2007).

"To convict a defendant of conspiracy, the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a 'co-conspirator') to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Id.* "The essence of a criminal conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators." *Id.* (citation omitted).

Although direct evidence of the defendant's criminal intent or the conspiratorial agreement "is rarely available," the Commonwealth may prove the defendant's intent and the agreement "through circumstantial evidence, such as by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators." *Id.* at 820. If the trier of fact finds an agreement existed, and that the defendant intentionally entered into it, the defendant "may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." *Id.* (citation omitted).

- 8 -

However, if there was only one conspiratorial agreement, there can only be one conspiracy conviction, regardless of the number of intended completed crimes, "so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship." 18 Pa.C.S.A. § 903(c). Courts consider the following factors to determine whether the evidence was sufficient to prove a single conspiracy or multiple conspiracies:

> the number of overt acts in common; the overlap of personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and, the degree to which interdependence is needed for the overall operation to succeed.

*Barnes*, 871 A.2d at 820 (citation omitted). *See id.* at 821 (holding evidence supported finding of only one continuous conspiracy to deliver cocaine, and vacating third-degree murder and robbery convictions, where only 24 hours lapsed from first drug sale to murder, the events took place at a single location, involved same actors, and were in furtherance of same objective); *Commonwealth v. Herrick*, 660 A.2d 51, 55 (Pa.Super. 1995) (finding distinct conspiracies existed where there were two drug transactions, involving the same people, the same location, held under similar circumstances, committed within a day of each other where record did not show the conspirators shared a common objective other than a general purpose to make money illicitly); *Commonwealth v. Perez*, 553 A.2d 79, 81 (Pa.Super. 1988) (finding only one conspiracy where appellant was "depicted as doing no more

than supplying . . . cocaine and marijuana to the Walters, who in turn dealt the drugs to others").

Here, the Commonwealth presented sufficient evidence to support the heroin conspiracy. According to the testimony at trial, on the day of the controlled buy, the CI communicated with both Jackson and Burnside regarding the purchase of heroin. He then purchased 16 bags of heroin from Jackson, while Burnside was present. Contrary to Jackson's contention, Burnside's testimony regarding his text messages with the CI supports the jury's conclusion that Jackson and Burnside acted in concert regarding the sale of heroin to the CI. That testimony also refutes Jackson's contention that such a conclusion was based on counsel's questions alone. The evidence was sufficient to establish all elements of the heroin conspiracy beyond a reasonable doubt.

However, the Commonwealth did not present sufficient evidence to support the remaining conspiracy convictions. The communication facility conspiracy conviction fails because there is no evidence that this was a separate conspiracy from the heroin conspiracy. Rather, the use of the communication facility occurred as part of, and to facilitate, the heroin conspiracy. **See Barnes**, 871 A.2d at 821.

Nor does the evidence support the multiple drug conspiracy, possession conspiracy, or drug paraphernalia conspiracy. Although during the execution of the search warrant, officers found drugs and drug paraphernalia in a bedroom on the second floor, and Jackson's license in that same bedroom,

the Commonwealth offered nothing at trial to connect Burnside to the bedroom with the narcotics. Other than Burnside's mere presence at the residence, the Commonwealth presented no evidence that Burnside and Jackson were in a conspiracy related to the narcotics and paraphernalia located upstairs. ***Barnes***, 871 A.2d at 812, 821.

Finally, we address the Fentanyl conspiracy. While conducting a strip search of Jackson, the police discovered Fentanyl in his rectum. The Commonwealth presented no evidence of an agreement between Jackson and Burnside related to the Fentanyl, and the evidence did not support a conviction for conspiracy for PWID of Fentanyl. ***See Barnes***, 871 A.2d at 821.

In sum, we find the Commonwealth presented sufficient evidence to support the heroin conspiracy conviction but failed to present sufficient evidence of the remaining conspiracy convictions. We therefore vacate the communication facility conspiracy, multiple narcotics conspiracy, possession conspiracy, drug paraphernalia conspiracy, and Fentanyl conspiracy. We remand this matter for re-sentencing by the trial court.

Judgment of sentence affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/07/2021